## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAMES OESTE
MARISSA OESTE
729 Montravel Court
Bel Air, Maryland 21015

    *on behalf of themselves and all*
*others similarly situated,*

      *Plaintiffs,*

  v.

ZYNGA, INC.,
444 De Haro Street, Suite 132
San Francisco, California 94107

    Serve on:    Maryland State Department of
                Assessments and Taxation
                Corporate Charter Division
                301 W. Preston Street, Room #801
                Baltimore, MD 21202

                CSC Lawyers Incorporating Service
                251 Little Falls Drive
                Wilmington, DE 19808

      *Defendant.*

CASE NO. _____

---

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs James Oeste and Marissa Oeste ("Named Plaintiffs"), on their own behalf and on behalf of all others similarly situated, through their attorneys, Cory L. Zajdel, Esq., Jeffrey C. Toppe, Esq., David M. Trojanowski, Esq., and Z Law, LLC, hereby submit this Class Action Complaint against Defendant Zynga, Inc. ("Zynga"), and for support state as follows:

## I.     PRELIMINARY STATEMENT

1.     Zynga, Inc. (hereinafter "Zynga" or "Defendant"), founded in April 2007, is a social game developer. Zynga is headquartered in San Francisco, California.

2.     Games developed by Zynga are targeted to audiences on mobile and social networking platforms.

3.     As of the date of the Zynga Data Breach (as defined and described herein), approximately 173 million unique accounts have been created on the Zynga platform.

4.     On September 12, 2019, Zynga reported that an unauthorized party gained access to approximately 173 million users' data ("Affected Individuals"), including names, email addresses, login IDs, passwords, password reset tokens, phone numbers, Facebook IDs, and Zynga account IDs.[1]

5.     Named Plaintiffs, both individually and on behalf of those similarly situated persons ("Class Members"), bring this Class Action to secure redress against Zynga for their reckless and negligent violations of customer privacy rights (the "Zynga Data Breach"). Affected Individuals are current and former customers who entrusted Zynga with their personally identifiable information ("PII"), including names, email addresses, login IDs, passwords, password reset tokens, phone numbers, Facebook IDs, and Zynga account IDs.

6.     Affected Individuals suffered injury. As a result of Zynga's wrongful actions and inactions, Affected Individuals' PII was stolen. Affected Individuals who used Zynga's services have had their PII compromised, their privacy rights violated, and have been exposed to the risk of fraud and identity theft.

---

[1] https://investor.zynga.com/news-releases/news-release-details/player-security-announcement (last visited June 8, 2020).

## II.   <u>JURISDICTION</u>

7.     This Court has subject matter jurisdiction over the state law claims asserted here pursuant to the *Class Action Fairness Act of 2005*, 28 U.S.C. § 1332(d)(2), since some of the Class Members are citizens of a state different from the Defendant and, upon the original filing of this complaint, members of the putative Plaintiffs class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million.

8.     The Court also has personal jurisdiction over the Parties because Zynga conducts regular and continuous business activity in Maryland.

9.     Venue is appropriate because, among other things: (a) Named Plaintiffs are both residents and citizens of this District; (b) the Defendant had directed its activities at residents in this District; (c) the acts and omissions that give rise to this Action took place, among others, in this judicial district.

10.     Venue is further appropriate pursuant to 28 U.S.C. § 1391 because Defendant conducts a large amount of its business in this District, and Defendant has substantial relationships in this District.   Venue is also proper in this Court because a substantial part of the events and omissions giving rise to the harm of the Class Members occurred in this District.

## III.   <u>PARTIES</u>

11.     Named Plaintiff, James Oeste, is a natural person currently residing at 729 Montravel Court, Bel Air, Maryland 21015.

12.     Named Plaintiff, Marissa Oeste, is a natural person currently residing at 729 Montravel Court, Bel Air, Maryland 21015.

13.     Defendant Zynga is incorporated under the laws of Delaware with its principal office and headquarters located in San Francisco, California.

IV.     **FACTUAL ALLEGATIONS**

   A. *Zynga's Method of Collecting Users' PII*

14.     Zynga develops some of the most popular mobile gaming applications, including Words With Friends, Words With Friends 2, Farmville, and Zynga Poker, among others. Zynga refers to itself as "a leading developer of the world's most popular social games that are played by millions of people around the world each day." As of the third quarter of 2019, Zynga had approximately 67 million monthly active users.

15.     Zynga offers most of its games for free, which a user may download on common application stores, such as Google Play or the iTunes store. The way Zynga profits from these "free" games is by in-app advertising, in-app purchases, and by collecting its users' PII.

16.     In order to download a game created by Zynga, a user must first create a user account with Zynga. To do so, the consumer is required to provide certain information, including the user's full name, email address, and gender, and the user must also create a password to secure his or her account. In lieu of creating an account directly through Zynga, users are able to link their Zynga account to their Facebook account. In such a situation, the user is not required to provide an email address directly to Zynga, since the email address associated with the Facebook account is used.

17.     As part of its standard operations, Zynga collects and retains its users' full names, email addresses, login IDs, passwords, password reset tokens, phone numbers, Facebook IDs, and Zynga account IDs. In the event that a consumer makes an in-app purchase and provides financial information to Zynga, Zynga retains that information as well.

18.     As part of its Privacy Policy, Zynga sets forth the type of PII it will collect from its users, and it also sets forth the ways in which it will use that PII. Zynga promises, in its Privacy Policy, that it will "implement reasonable and appropriate security measures to help protect the

security of your information both online and offline and to ensure that your data is treated securely."[2]

19.     Named Plaintiffs each created a Zynga account on or before the date of the Zynga Data Breach and are Affected Individuals.

20.     As part of the process for creating their accounts, both Named Plaintiffs provided to Zynga the above-described PII. In providing this PII, Named Plaintiffs expected and believed that Zynga would provide an adequate measure of protection to and safekeeping of their PII. Had they known that Zynga did not have sufficient measures in place to protect and safeguard their PII, they would not have created a Zynga account, used Zynga games, and would not have been willing to pay any amount of money, let alone the amount of money they paid, for paid apps and/or in-app purchases.

**B.   *The Zynga Data Breach***

21.     On or before September 12, 2019, Zynga suffered a data breach at the hands of the hacker called "Gnosticplayers." Gnosticplayers breached 173 million accounts for users of the popular game Words With Friends. Gnosticplayers also "claims to have hacked data belonging to some other Zynga-developed games, including Draw Something and discontinued OMGPOP game, which allegedly exposed clear text passwords for more than 7 million users."[3]

---

[2] *Privacy Policy*, Zynga (Sep. 9, 2019), https://web.archive.org/web/20190909053717/https://www.zynga.com/privacy/policy (last visited June 8, 2020).

[3] Swati Khandelwal, *Exclusive—Hacker Steals over 218 Million Zynga 'Words with Friends' Gamers Data,* Hacker News (Sep. 29, 2019), https://thehackernews.com/2019/09/zynga-game-hacking.html (last visited June 8, 2020).

22.     Gnosticplayers obtained the following Zynga user information as a result of the hack: names, email addresses, login IDs, passwords, password reset tokens, phone numbers, Facebook IDs, and Zynga account IDs (collectively, the "PII").[4]

23.     Gnosticplayers claims to have stolen and sold PII on the dark web of over "one billion user credentials and personal details stolen from roughly 44 companies."[5]

24.     Zynga chose not to notify its users of the data breach by email. Zynga did not even feel it necessary to notify players of the data breach by pushing a notification through their mobile applications. Rather, Zynga only posted a "Player Security Announcement" to its website on September 12, 2019, stating that "certain player account information may have been illegally accessed by outside hackers."[6]

25.     Likely only a minority of Zynga's users know that their PII has been illegally accessed by hackers. There simply is no reason for a user to access the Zynga website when using a mobile application, and so most Zynga users never come across this "Player Security Announcement." The only way for a user to know that his or her PII has been unlawfully accessed is if that user were to access Zynga's website on a web browser, or notice instances of fraud or identity theft. By then, it is too late to take protective measures.

_____

[4] *Id.*

[5] Cyware News, *Times when 'Gnosticplayers' hacker made headlines for selling troves of stolen data on dark web,* Cyware Social (Sep. 30, 2019), https://cyware.com/news/times-when-gnosticplayers-hacker-made-headlines-for-selling-troves-of-stolen-data-on-dark-web-f8849502 (last visited June 8, 2020).

[6] https://zyngasupport.helpshift.com/a/zynga/?p=all&l=en&s=announcements&f=player-security-announcement (last visited June 8, 2020).

26.     Furthermore, Named Plaintiffs' and the class members' PII was accessible in plain text formatting (with the exception of some passwords). Thus, Zynga did not take adequate data security measures to store and protect its users' PII.

27.     Perhaps more troublingly, Zynga stored its users' passwords with "SHA1" encryption. For at least two years prior to the Zynga Data Breach, it was well known that SHA1 encryption was an inadequate measure of security, especially for protecting passwords and other sensitive information.[7]

28.     Zynga knew (and intentionally ignored and accepted the risk) that storing users' passwords and other sensitive information using SHA1 encryption would make Zynga a likely target for hackers. These known security flaws only amplify the damage done to the victims of the breach.

29.     At all relevant times, Zynga knew, or reasonably should have known, that the PII collected, maintained, and stored on its servers was highly sensitive, susceptible to attack, and could be used for malicious purposes by third parties, for reasons such as identity theft, fraud, and/or other misuse.

30.     In fact, in a form filed with the SEC one month prior to the hack (Form 10-Q For the Quarterly Period Ended June 30, 2019, Zynga, Inc.), Zynga acknowledged that it had "experienced and will continue to experience hacking attacks of varying degrees from time to time,

---

[7] *See, e.g.*, Lucian Constantin, *The SHA1 hash function is now completely unsafe*, Computerworld (Feb. 23, 2017), https://www.computerworld.com/article/3173616/the-sha1-hash-function-is-now-completely-unsafe.html (last visited June 8, 2020).

including denial-of-service attacks. Because of our prominence in the social game industry, we believe we are a particularly attractive target for hackers."[8]

31.     Notwithstanding this knowledge, Zynga completely failed to take adequate measures to protect Named Plaintiffs' and the class members' PII.

**C.  *Stolen Information is Valuable to Hackers and Thieves***

32.     It is well known, and the subject of many media reports, that PII is highly coveted and a frequent target of hackers.

33.     Despite well-publicized litigation and frequent public announcements of data breaches, Zynga opted to maintain an insufficient and inadequate system to protect the PII of Named Plaintiffs and Affected Individuals.

34.     Zynga negligently and recklessly put Named Plaintiffs' and class members' PII at risk and the PII, on information and belief, was actually stolen.

35.     Legitimate organizations and criminal underground alike recognize the value of PII.  Otherwise, they would not aggressively seek or pay for it.

36.     As previously seen in one of the world's largest breaches, hackers compromised the card holder data of 40 million customers.  *See* "Target: 40 million credit cards compromised," CNN 1 Money, Dec. 19, 2013, *available* at

http://money.cnn.com/2013/12/18/news/companies/target-credit-card/ (last visited June 8, 2020).

37.     Credit or debit card information is highly valuable to hackers. Credit and debit card information that is stolen from the point of sale are known as "dumps."  *See* Krebs on Security April 16, 2016, Blog Post, *available at* https://krebsonsecurity.com/2016/04/all-about-fraud-how-

---

[8] Form 10-Q For the Quarterly Period Ended June 30, 2019, Zynga, Inc. (filed Aug. 1, 2019) at 49, https://www.sec.gov/Archives/edgar/data/1439404/000156459019028029/0001564590-19-028029-index.html (last visited June 8, 2020).

crooks-get-the-cvv/ (last visited June 8, 2020).

38.     Credit and debit card dumps can be sold in the cybercrime underground for a retail value of about "$20 apiece." *Id.*

39.     This information can also be used to clone a debit or credit card. *Id.*

**D.   *The Zynga Data Breach Has and Will Result in Additional Identity Theft/Fraud***

40.     Zynga failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the data breach.

41.     The ramification of Zynga's failure to keep its users' data secure is severe. For instance, on information and belief, the database stolen in the Zynga Data Breach is for sale on the black market. This is especially troubling since people tend to use the same username/password combination across multiple platforms (*i.e.* a user might have one username/password combination for multiple different websites). So whoever acquires this database will likely have access to millions of username/password combinations that may be used on websites *other than* Zynga's.

42.     All merchants that accept customer payments via payment cards, including Zynga, are obligated and required to comply with the Payment Card Industry Data Security Standards (the "PCI DSS"). *Maintaining Payment Security*, *Payment Card Industry Security Standards*, *available* at*: https://www.pcisecuritystandards.org/pci_security/maintaining_payment_security* (last visited June 8, 2020) (stating "[i]f you accept or process payment cards, the PCI Data Security Standards apply to you.").

43.     Compliance with the PCI DSS is common practice in the gaming industry. The PCI DSS, among other things, mandates merchants to protect cardholder data, PCI DSS v. 3.0 at 34 (Nov. 2013), requires merchants to install and maintain firewalls, *id.* at 19, forbids merchants from using default settings and passwords for applications and devices, *id.* at 28, requires merchants to segment cardholder data, *id.* at 61, and requires merchants to identify and authenticate their system

users. *Id.* at 64.

44.     Additionally, sub-requirement 3.2 of the PCI DSS requires merchants and other organizations involved in payment card transactions to refrain from storing sensitive authentication data after authorization (even if it is encrypted).  *See id.* at 35. To adhere to the PCI DSS, a merchant must, *inter alia*:

> First, **Assess** -- identify cardholder data, take an inventory of your IT assets and business processes for payment card processing, and analyze them for vulnerabilities that could expose cardholder data. Second, **Remediate** -- fix vulnerabilities and do not store cardholder data unless you need it. Third, **Report** -- compile and submit required remediation validation records (if applicable), and submit compliance reports to the acquiring bank and card brands you do business with.

*How to Be Compliant: Getting Started with PCI Data Security Standard Compliance*, PCISSC, *available   at*   https://www.pcisecuritystandards.org/merchants/how_to_be_compliant.php   (last visited June 8, 2020) (emphasis in original).

45.     According to Javelin Strategy and Research, "one in every three people who is notified of being a potential fraud victim becomes one . . . with 46% of consumers who had cards breached becoming fraud victims that same year." "Someone Became an Identity Theft Victim Every 2 Seconds Last Year," Fox Business, Feb. 5, 2014 *available* at https://www.foxbusiness.com/features/someone-became-an-identity-theft-victim-every-2-seconds-last-year (last visited June 8, 2020).

46.     It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again.

47.     On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems." *See* "Victims of Identity

Theft," U.S. Department of Justice, Dec 2013, *available at* https://www.bjs.gov/content/pub/pdf/vit12.pdf (last visited June 8, 2020). In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*. at 11.

### E.   *Annual Monetary Losses From Identity Theft Are in the Billions of Dollars*

48.     Javelin Strategy and Research reports that those losses increased to $21 billion in 2013. *See* 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters, *available* at: https://www.javelinstrategy.com/coverage-area/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 8, 2020). There may be a time lag between when harm occurs and when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.
>
> As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

GAO, Report to Congressional Requesters, at 33 (June 2007), *available* at http://www.gao.gov/new.items/d07737.pdf (last visited June 8, 2020).

49.     Affected Individuals now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

50.     Affected Individuals are incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.

### F.  *Affected Individuals Suffered Damages*

51.    The Zynga Data Breach was a direct and proximate result of Zynga's failure to properly safeguard and protect Affected Individuals' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Zynga's failure to establish and  implement appropriate administrative, technical, and physical safeguards to ensure the security and  confidentiality of Affected Individuals' PII to protect against reasonably foreseeable threats to the security or integrity of such information.

52.    Affected Individuals' PII is private and sensitive in nature and was inadequately protected by Zynga.

53.    Zynga did not obtain Affected Individuals' consent to disclose their PII, except to certain persons not relevant to this action, as required by applicable law and industry standards.

54.    As  a direct  and proximate result of  Zynga's wrongful action and inaction and the resulting Zynga Data Breach, Affected Individuals have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time and effort to mitigate the actual and potential impact of the subject data breach on their lives by, among other things, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and closely reviewing and monitoring their credit reports and accounts for unauthorized activity.

55.    As  a result of the Zynga Data Breach,  Affected Individuals' debit cards and credit cards were exposed and subjected to unauthorized charges; their bank accounts were overdrawn and credit limits exceeded; they were deprived of the  use of their cards and access to their funds; their preauthorized charge relationships were disrupted; they were required to expend time, energy and expense to address and resolve these financial disruptions and mitigate the consequences; and they suffered consequent emotional distress and their credit and debit card information is at an

increased risk of theft and unauthorized use.

56.    Affected Individuals were deprived of the use of their credit and debit cards for appreciable periods of time and were unable to access their accounts or their funds; lost accumulated miles and points toward bonus awards and were unable to earn points during the interval their cards were inactivated; were required to pay fees to issuing banks for replacement cards; were required to cancel and change their registered numbers with online sellers; were required to change the pre-authorizations; were placed in non-payment status by virtue of their cards being overdrawn or abruptly cancelled and were required to pay penalties and service reinstatement fees; purchased identity theft insurance and credit monitoring services to protect themselves against possible consequences of the breach; suffered emotional distress as they were forced to cope with the unauthorized charges and other consequences of the Zynga Data Breach and were still not aware of the Zynga Data Breach or that their PII was compromised.

57.    Some Affected Individuals did not cancel their debit and credit cards and continue to experience fraudulent activity on their accounts.

58.    Zynga's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Affected Individuals' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    Theft of their PII, including, on information and belief, actual theft of credit/debit card numbers;

b.    The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and already misused via the sale of Affected Individuals' information on the Internet black market;

c.      The untimely and inadequate notification of the Zynga Data Breach;

d.      The improper disclosure of Affected Individuals' PII;

e.      Loss of privacy;

f.      Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the data breach;

g.      Ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market;

h.      Overpayments to Zynga for credit reporting services during the subject data breach in that a portion of the price paid for such use by Affected Individuals to Zynga was for the costs of reasonable and adequate safeguards and security measures that would protect customers' PII, which Zynga and its affiliates did not implement and, as a result, Affected Individuals did not receive what they paid for and were overcharged by Zynga; and

i.      Deprivation of rights under the Unfair Competition Laws.

## V.      <u>CLASS ACTION ALLEGATIONS</u>

59.     Named Plaintiffs bring this action on their own behalf and pursuant to the FEDERAL RULES OF CIVIL PROCEDURE 23(b)(2) and (b)(3).

60.     Named Plaintiffs seek certification of a Nationwide Class ("Nationwide Class") consisting of:

> **All persons residing in the United States, including the District of Columbia, whose PII was disclosed in the Zynga Data Breach.**

61.     Excluded from the Class are those individuals who now are or have ever been executives of the Defendant and the spouses, parents, siblings, and children of all such individuals.

62.     The Class, as defined above, is identifiable. Named Plaintiffs are members of the Class.

14

63.     The Class consists, at a minimum, of one hundred (100) individuals and is thus so numerous that joinder of all members is clearly impracticable.

64.     There are questions of law and fact which are not only common to the Class but which predominate over any questions affecting only individual Class Members.

65.     The common and predominating questions include, but are not limited to:

a)   Whether Zynga owed a duty of care to Affected Individuals with respect to the security of their personal information;

b)   Whether Zynga took reasonable steps and measures to safeguard Affected Individuals' PII;

c)   Whether Zynga violated common and statutory law by failing to promptly notify Affected Individuals that their PII was compromised;

d)   Whether Zynga has an implied contractual obligation to use reasonable security measures;

e)   Whether Zynga complied with any implied contractual obligation to use reasonable security measures;

f)   Whether Zynga's acts and omissions described herein give rise to a claim of negligence;

g)   Whether Zynga knew or should have known of the security breach prior to its September 2019 disclosure;

h)   Whether Zynga had a duty to promptly notify Affected Individuals that their PII was, or potentially could be, compromised;

i)   Whether Zynga promptly notified Affected Individuals that their PII was, or potentially could be, compromised;

j)   What security measures, if any, must be implemented by Zynga to comply with its implied contractual obligations;

k)   Whether Affected Individuals are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

66.   Claims of Named Plaintiffs are typical of the claims of the respective members of the Class and are based on and arise out of similar facts constituting the wrongful conduct of Zynga.

67.   Named Plaintiffs will fairly and adequately protect the interests of the Class.

68.   Named Plaintiffs are committed to vigorously litigating this matter.

69.   Further, Named Plaintiffs have secured counsel experienced in handling consumer class actions and complex consumer litigation.

70.   Neither Named Plaintiffs, nor their counsel, have any interests which might cause them not to vigorously pursue this claim.

71.   The likelihood that individual members of the Class will prosecute separate actions in court is remote due to the time and expense necessary to conduct such litigation.

72.   Counsel for Named Plaintiffs and the Class are experienced in class actions and foresee little difficulty in the management of this case as a class action.

## VI.   CAUSES OF ACTION

### COUNT ONE
### BREACH OF IMPLIED CONTRACT
### (On behalf of the Nationwide Class)

73.   Named Plaintiffs incorporate by reference all of the allegations herein as if each and every allegation is set forth fully herein.

74.   Zynga solicited and invited Affected Individuals to create accounts and use Zynga's online services.

16

75.     Affected Individuals accepted Zynga's offers by creating Zynga accounts and using Zynga's online services.

76.     When Affected Individuals created accounts and used Zynga's online services, they provided their PII.

77.     In so doing, Affected Individuals entered into implied contracts with Zynga to which Zynga agreed to safeguard and protect such information and to timely and accurately notify Affected Individuals if their data had been breached and compromised.

78.     Affected Individuals would not have provided and entrusted their PII to Zynga in the absence of the implied contract between them and Zynga.

79.     Affected Individuals fully performed obligations under the implied contracts with Zynga.

80.     Zynga breached the implied contract it made with Affected Individuals by failing to safeguard and protect the PII of Affected Individuals and by failing to provide timely and accurate notice that their PII was compromised as a result of the Zynga Data Breach.

81.     As a direct and proximate result of Zynga's breaches of the implied contracts between Zynga and Affected Individuals, Affected Individuals sustained actual losses and damages as described in detail above.

## COUNT TWO
## BREACH OF CONTRACT
### (On behalf of the Nationwide Class)

82.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

83.     When users sign up for a Zynga account, they must agree to Zynga's Privacy Policy ("Privacy Policy"). Therefore, the Privacy Policy constitutes an agreement between Zynga and those who provide their PII to Zynga, including Named Plaintiffs and the class members.

84.     The Privacy Policy is expressly made applicable to every person who uses Zynga's services, including their games, products, services, content, Zynga.com, and/or domain or website operated by Zynga. The Privacy Policy sets forth how Zynga will protect its users' PII, and how Zynga will use the PII provided by its users.

85.     The Privacy Policy details specifically what types of PII will be shared and with whom. Zynga agrees that it will "implement reasonable and appropriate security measures to help protect the security of your information both online and offline and to ensure that your data is treated securely."

86.     Named Plaintiffs and class members formed a contract with Zynga, when Named Plaintiffs and class members provided PII to Zynga, which was at all relevant times subject to the Privacy Policy and further when Named Plaintiffs and class members used Zynga's services.

87.     Named Plaintiffs and class members have performed their obligations fully under their contracts with Zynga.

88.     By failing to protect Named Plaintiffs' and the class members' PII, Zynga breached failed to fulfil its obligations under the agreement, and thus breached the agreement. Specifically, Zynga (1) failed to use reasonable measures to protect that information; and (2) disclosed that information to unauthorized third parties, in violation of the agreement.

89.     As a direct and proximate result of these breaches of contract, Named Plaintiffs and class members sustained actual losses and damages as described in detail above, including but not limited to the loss of their benefit of the bargain pursuant to which they provided their PII to Zynga.

**COUNT THREE**
**NEGLIGENCE**
**(On behalf of the Nationwide Class)**

90.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

91.     A special relationship exists between Zynga and Affected Individuals.

92.     Zynga actively solicited Affected Individuals to create accounts and use their PII in sales transactions on Zynga's website.

93.     When Affected Individuals gave their PII to Zynga to create an account and/or facilitate and close sales transactions, they did so with the mutual understanding that Zynga had reasonable security measures in place and Zynga would take reasonable steps to protect and safeguard the PII of Affected Individuals. Affected Individuals also gave their PII to Zynga on the premise that Zynga was in a superior position to protect against the unauthorized access, theft and misuse of that information.

94.     Upon accepting Affected Individuals' PII in their system, Zynga undertook and owed a duty to Affected Individuals to exercise reasonable care to secure and safeguard that information from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties, and to utilize commercially reasonable methods to do so. This duty included, among other things, designing, maintaining, and testing Zynga's security systems to ensure that Affected Individuals' PII was adequately secured and protected.

95.     Zynga further had a duty to implement processes that would detect a breach of its security system in a timely manner.

96.     Zynga had a duty to timely disclose to Affected Individuals that their PII had been or was reasonably believed to have been compromised. Timely disclosure was appropriate so that, among other things, Affected Individuals could take appropriate measures to avoid use of bank funds, and monitor their account information and credit reports for fraudulent activity.

97.     Zynga breached its duty to discover and to notify Affected Individuals of the unauthorized access by failing to discover the security breach within reasonable time and by failing to notify Affected Individuals of the breach timely.

98.     To date, Zynga has not provided sufficient information to Affected Individuals regarding the extent and scope of the unauthorized access and continues to breach its disclosure obligations to Affected Individuals.

99.     Zynga also breached its duty to Affected Individuals to adequately protect and safeguard this information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PII.

100.    Furthering its negligent practices, Zynga failed to provide adequate supervision and oversight of the PII with which it is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a third party to gather Affected Individuals' PII, misuse the PII, and intentionally disclose it to others without consent.

101.    Through Zynga's acts and omissions described in this Complaint, including Zynga's failure to provide adequate security and its failure to protect Affected Individuals' PII from being foreseeably captured, accessed, disseminated, stolen, and misused, Zynga unlawfully breached its duty to use reasonable care to adequately protect and secure Affected Individuals' PII during the time it was within Zynga's control.

102.    Further, through its failure to timely discover and provide clear notification of the Zynga Data Breach to consumers, Zynga prevented Affected Individuals from taking meaningful, proactive steps to secure their PII.

103.    Upon information and belief, Zynga improperly and inadequately safeguarded the PII of Affected Individuals in deviation from standard industry rules, regulations, and practices at the time of the data breach.

104.    Zynga's failure to take proper security measures to protect Affected Individuals' sensitive PII as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Affected Individuals' PII.

105.    Zynga's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the PII; failing to conduct adequate regular security audits; failing to provide adequate and appropriate supervision of persons having access to Affected Individuals' PII.

106.    Affected Individuals did not contribute to the Zynga Data Breach and subsequent misuse of their PII as described in this Complaint.

107.    As a direct and proximate result of Zynga's negligence, Affected Individuals sustained actual losses and damages as described in detail above.

## COUNT FOUR
### NEGLIGENCE *PER SE*
### (On behalf of the Nationwide Class)

108.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

109.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" which includes the unfair act or practice by Zynga of failing to use reasonable measures to protect Named Plaintiffs' and class members' PII. Several FTC publications and orders also form the basis of Zynga's duty.

110.    By failing to implement reasonable measures to protect Named Plaintiffs' and class members' PII, and by failing to comply with industry standards for security practices, Zynga

violated § 5 of the FTC Act (and similar state statutes). Zynga's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Zynga's systems.

111.   Defendant's violation of § 5 of the FTC Act (and similar state statutes) constitutes negligence *per se*.

112.   Named Plaintiffs and class members are consumers within the class of persons § 5 of the FTC Act (and similar state statutes) was intended to protect.

113.   Additionally, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to protect against. In fact, the FTC has initiated more than fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and engagement in unfair and deceptive practices, caused the same harm suffered by Named Plaintiffs and class members alleged herein.

114.   As a direct and proximate result of Defendant's negligence, Named Plaintiffs and class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Zynga Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the

PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## COUNT FIVE
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On behalf of the Nationwide Class)

115.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

116.    The law implies a covenant of good faith and fair dealing in every contract.

117.    Affected Individuals contracted with Zynga by accepting Zynga's offers and paying for Zynga's online services.

118.    Affected Individuals performed all of the significant duties under their agreements with Zynga.

119.    The conditions required for Zynga's performance under the contract has occurred.

120.    Zynga did not provide and/or unfairly interfered with and/or frustrated the right of Affected Individuals to receive the full benefits under their agreement.

121.    Zynga breached the covenant of good faith and fair dealing implied in its contracts with Affected Individuals by failing to use and provide reasonable and industry-leading security practices.

122.    Affected Individuals were damaged by Zynga's breach in that they paid for, but never received, the valuable security protections to which they were entitled, and which would have made their products and services more valuable.

## COUNT SIX
## BREACH OF CONFIDENCE
### (On behalf of the Nationwide Class)

123.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

124.   At all times relevant hereto, including the time during which Named Plaintiffs and class members interacted with Zynga, Zynga had full knowledge of the confidential and sensitive nature of Named Plaintiffs' and class members' PII.

125.   Zynga's relationship with Named Plaintiffs and class members was governed by specific terms and expectations that Named Plaintiffs' and class members' protected PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

126.   Named Plaintiffs and class members provided their respective PII to Zynga with the explicit and implicit understandings that Defendant would protect and not permit the PII to be disseminated to the public or any unauthorized parties.

127.   Named Plaintiffs and class members also provided their respective PII to Zynga with the explicit and implicit understandings that Defendant would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

128.   Zynga voluntarily received in confidence Named Plaintiffs' and class members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

129.   Due to Zynga's failure to prevent, detect, avoid the Zynga Data Breach from occurring by following best information security practices to secure Plaintiffs' and class members' PII, Named Plaintiffs' and class members' PII was disclosed and misappropriated to the public and unauthorized third parties beyond Named Plaintiffs' and class members' confidence, and without their express permission.

130.    But for Defendant's disclosure of Named Plaintiffs' and class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. The Zynga Data Breach was the direct and legal cause of the theft of Named Plaintiffs' and class members' PII, as well as the resulting damages.

131.    The injury and harm Named Plaintiffs and class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Named Plaintiffs' and class members' PII. Zynga knew its computer systems and technologies for accepting, securing, and storing Named Plaintiffs' and class members' PII had serious security vulnerabilities because Zynga failed to observe even basic information security practices or correct known security vulnerabilities.

132.    As a direct and proximate result of Defendant's breaches of confidence, Named Plaintiffs and class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Zynga Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**COUNT SEVEN**
**VIOLATION OF CALIFORNIA CIVIL CODE § 1798.80 *et. seq***
**(On behalf of the Nationwide Class)**

133.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

134.    Zynga owns, licenses and/or maintains computerized data that includes Affected Individuals' PII.

135.    Zynga was required to, but failed, to take all reasonable steps to dispose, or arrange for the disposal, of records within its custody or control containing PII when the records were no longer to be retained, by shredding, erasing, or otherwise modifying the personal information in those records to make it unreadable or undecipherable through any means.

136.    Zynga was required to, but failed, to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Zynga Data Breach.

137.    The Zynga Data Breach constituted a "breach of the security system" within the meaning of section 1798.82(g) of the California Civil Code.

138.    The information compromised in the Zynga Data Breach constituted "personal information" within the meaning of section 1798.80(e) of the California Civil Code.

139.    California Civil Code § 1798.82(a) requires disclosure of data breaches "in the most expedient time possible and without unreasonable delay[.]"

140.    Zynga violated Cal. Civ. Code § 1798.82(a) by unreasonably delaying disclosure of the Zynga Data Breach to Affected Individuals whose PII was, or was reasonably believed to have been, acquired by an unauthorized person.

141.    Upon information and belief, no law enforcement agency instructed Zynga that notification to Affected Individuals would impede a criminal investigation.

142.     As a result of Zynga's violation of Cal. Civ. Code § 1798.80, *et seq.*, Affected Individuals incurred economic damages, including expenses associated with monitoring their personal and financial information to prevent further fraud.

143.     Named Plaintiffs, both individually and on behalf of the Class, seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to: (a) actual damages suffered by Affected Individuals; (b) statutory damages for Zynga's willful, intentional, and/or reckless violations ; (c) equitable relief; and (d) reasonable attorneys' fees and costs.

144.     Because Zynga was guilty of oppression, fraud or malice, in that it failed to act with a willful and conscious disregard of Affected Individuals' rights, Named Plaintiffs also seek punitive damages.

## <u>COUNT EIGHT</u>
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200 UNLAWFUL BUSINESS PRACTICE
### (On behalf of the Nationwide Class)

145.     Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

146.     Zynga engaged in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code §17200.

147.     Zynga engaged in unlawful acts and practices with respect to its services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Affected Individuals' PII with knowledge that the information would not be adequately protected; and by gathering Affected Individuals' PII in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Zynga to take reasonable methods of safeguarding Affected Individuals' PII.

148.    In addition, Zynga engaged in unlawful acts and practices with respect to its services by failing to discover and then disclose the Zynga Data Breach to Affected Individuals in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

149.    To date, Zynga has still not provided such sufficient information to Affected Individuals.

150.    As a direct and proximate result of Zynga's unlawful acts and practices, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

151.    Zynga knew or should have known that its system had been breached and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

152.    Zynga's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

153.    Affected Individuals seek relief under Cal. Bus. & Prof. Code § 17200, *et. seq*., including, but not limited to, restitution to Affected Individuals of money or property that Zynga may have acquired by means of its unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Zynga because of its unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

## COUNT NINE
## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200 UNLAWFUL BUSINESS PRACTICE
### (On behalf of the Nationwide Class)

154.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

155.    Zynga engaged in unfair acts and practices by soliciting and collecting Affected Individuals' PII with knowledge that the information would not be adequately protected; while Affected Individuals' PII would be processed in an unsecure electronic environment.

156.    These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Affected Individuals.

157.    The unfair acts and practices were likely to deceive the public into believing their PII was secure, when it was not.

158.    The harm these practices caused to Affected Individuals outweighed their utility, if any.

159.    Zynga engaged in unfair acts and practices with respect to the provision of its services by failing to enact adequate privacy and security measures and protect Affected Individuals' PII from further unauthorized disclosure, release, data breaches, and theft, and failing to timely discovery and give notice of the Zynga Data Breach.

160.    As a direct and proximate result of Zynga's unfair practices and acts, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

161.    Zynga knew or should have known that its systems and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

162.    Zynga's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

**COUNT TEN**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200 FRAUDULENT/DECEPTIVE BUSINESS PRACTICES**
**(On behalf of the Nationwide Class)**

163.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

164.    Zynga engaged in fraudulent and deceptive acts and practices by representing and advertising that it would maintain adequate data privacy and security practices and procedures to safeguard the Affected Individuals' PII from unauthorized disclosure, release, data breaches, and theft; and representing and advertising that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the members of Affected Individuals' PII. These representations were likely to deceive members of the public, including Affected Individuals, into believing their PII was securely stored, when it was not, and that Zynga was complying with relevant law, when it was not.

165.    Zynga engaged in fraudulent and deceptive acts and practices by omitting, suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Affected Individuals' PII. At the time that Affected Individuals were creating accounts and using Zynga's online services, Zynga failed to disclose to Affected Individuals that its data security systems failed to meet legal and industry standards for the protection of their PII.

166.     Affected Individuals would not have created accounts with Zynga or used Zynga's online services if they had known about its substandard data security practices.

167.     These representations were likely to deceive members of the public, including Affected Individuals, into believing their PII was secure, when it was not, and that Zynga was complying with relevant law and industry standards, when it was not.

168.     As a direct and proximate result of Zynga's deceptive practices and acts, Affected Individuals were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their PII, and additional losses described above.

169.     Zynga knew or should have known that its system and data security practices were inadequate to safeguard Affected Individuals' PII and that the risk of a data breach or theft was highly likely.

170.     Zynga's actions in engaging in the abovenamed unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to Affected Individuals' rights.

171.     Affected Individuals seek relief under Cal. Bus. & Prof. Code § 17200, *et. seq.*, including, but not limited to, restitution to Affected Individuals of money or property that Zynga may have acquired by means of its fraudulent and deceptive business practices, restitutionary disgorgement of all profits accruing to Zynga because of its fraudulent and deceptive business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

## COUNT ELEVEN
## CONSTITUIONAL INVASION OF PRIVACY
### (On behalf of the Nationwide Class)

172.    Named Plaintiffs re-allege and incorporate by reference the allegations set forth herein, and further allege:

173.    Cal. Const., Art. 1., section 1 provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

174.    Affected Individuals had a legally protected privacy interest in the PII provided to Zynga.

175.    Affected Individuals had a reasonable expectation of privacy as to the PII they provided to Zynga under the circumstances of their purchases.

176.    Zynga's actions and inactions amounted to a serious invasion of Affected Individuals' protected privacy interests.

177.    Zynga's invasion of Affected Individuals' reasonable expectation of privacy caused Affected Individuals to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs, both individually and on behalf of all Affected Individuals, respectfully request that this Court:

A.  Assume jurisdiction of this case;

B.  Enter an order certifying the Nationwide Class;

C.  Enter an order awarding actual and compensatory damages, in an amount to be determined;

D.  Enter an order awarding costs of suit and attorneys' fees, as allowable by law;

E.  Enter an order awarding punitive damages, in an amount to be determined; and

Such other and further relief as this court may deem just and proper.

Respectfully submitted,

**Z LAW, LLC**

Dated: June 9, 2020                    **Cory L. Zajdel    /s/ 28191**
Cory L. Zajdel (Fed. Bar #28191)
David M. Trojanowski (Fed. Bar #19808)
Jeffrey C. Toppe (Fed. Bar #20804)
2345 York Road, Ste. B-13
Timonium, MD 21093
(443) 213-1977
clz@zlawmaryland.com
dmt@zlawmaryland.com
jct@zlawmaryland.com

**Attorneys for Plaintiffs**